Good morning. I would like to reserve three minutes at the end for rebuttal. May it please the court. My name is Barry Arrington. I represent the appellants today. This challenge stems from the fact that gun violence is not just a criminal offense.  This statute has two separate and analytically distinct components, the manufacturing ban and the serialization requirement. The manufacturing ban prohibits flat out the manufacturing of frames and receivers whether or not they have serial numbers. The serialization requirement applies in two separate and distinct situations. It prohibits the sale of unfinished frames and receivers, finished frames and receivers and firearms unless they have serial numbers. And it prohibits the possession of unfinished frames and receivers, frames and receivers and firearms unless they have serial numbers. The district court held that these plaintiffs do not have standing to challenge the manufacturing ban because it does not apply to prohibit completing firearm receivers and frames that are purchased online from companies like Polymer 80. The problem with that is, from the face of the statute, it plainly does prohibit such activities. And not only is it plain from the face of the statute, if you look to the legislative history, that was indeed the primary purpose of the statute. So the district court erred when it held that the statute did not prohibit that which it was primarily passed to prohibit. The district court upheld the serialization requirement as a regulation of commercial sales. As applied to these plaintiffs, the evidence was they made these firearms for their personal use. They did not contemplate a sale, nor did they ever sell such firearms. So it was an error to uphold the statute as a regulation of commercial sales because there were no sales. It seems that a sale, either contemplated or actual, would be the sine qua non of a regulation of commercial sales. Is a party-to-party sale a commercial sale? A party-to-party sale, a commercial sale. So there is an interesting debate going on, actually, in the ATF about what a commercial sale is with respect to regulating sales of these sorts of things. How many sales does it require to be a commercial sale? The ATF has taken a position that it could be just one sale. Depending on other factors. There's another lawsuit brewing about that. That's correct. The gun show idea and all that stuff. That's correct. That does not apply to this case because there was no sales either made or contemplated. So we don't care if they were commercial or non-commercial because there were no sales. Correct, Your Honor. The district court did not effectively analyze whether the serialization requirement or the manufacturing ban was consistent with the nation's history and tradition of firearms regulation as required by brewing. Had it done so, it would have determined that they are plainly not consistent with that history and tradition. And with that, I will open up to questions that the court may have. What, in your view, perhaps, you could start there. What, in your view, should the district court have done? The district court should have held that the manufacturing ban is unconstitutional on its face because it's a flat-out prohibition of an activity that has roots dating back to before the revolution. The district court should have enjoined the serialization requirement as applied to these plaintiffs. The plaintiffs take no position about whether serialization is a valid regulation of commercial sales. But as applied to them, where there was no sales, it can't be. Well, the district court pretty much thought the Second Amendment didn't apply here. Can you address that? The district court addressed this at the textual level. And there is a debate about whether the commercial sale regulation applies at the textual level or at the history and tradition level of the brewing test, as this court contemplated in a previous case that came out just a couple months ago. But this court held that it didn't apply even at the textual level because it was apparently commercial sales are not textually covered by the Second Amendment. But you think, so which stage would you think brewing applies? So I think brewing applies at both stages. At the first stage, they want to make firearms. And acquiring firearms is clearly implied as a right under the text of the Second Amendment. Well, how can you help me with the clearly implied? OK. So the Second Amendment says that people have the right to keep and bear arms. Well, doesn't that, I mean, I'm just anticipating what your opponent's argument is going to be. But doesn't that presume that the firearm is a firearm at that point? Keep and bear arms. It has to be in arms. Exactly. And so in order, there are two ways to keep them. Well, you have to acquire arms in order to keep and bear them. And there are various ways of acquiring arms. You can go out and you can steal one. You can have one given to you. You can purchase one. Or in this country, there's a centuries-old tradition of making them that goes back prior to the Revolution. And in this case, this statute prohibits acquiring arms by making them. And that's why the text applies. The text having applied, you go on to the next step, and that is the history and tradition. Now, there was quite a bit of testimony at the hearing about the history and tradition of making guns at the time of the founding. And the state's own witness, and as you saw, I quoted the state's own witness extensively in my briefs, more or less gave away the story because the state's witness, expert witness, admitted that there was a tradition of making firearms at the time of the founding. And not only was it not regulated, it was encouraged. The Continental Congress actually paid private people to make firearms. And so we have this tradition of going back to the founding of privately made firearms. And we have the founders knew about that activity. In fact, they encouraged it. They did not regulate it, much less prohibit it, as the state of Colorado has done. As applies to the serialization requirement, going back to the founding, was there any serialization requirement? And the state, to its credit, hunted and hunted and hunted and found a couple of statutes that said, well, we have to stamp these arms as part of the proving process. Well, that is not, Bruin, is that analogous to what's going on here? Bruin says that everything is analogous to everything at a high enough level of generality. You have to go to the how and why of the statute. The how of that statute was you had a single number stamped on every barrel that was proved. It was not for identification purposes. It was for indicating that it was proved. The why was, as I said, indicating that it was proved. It had nothing to do with the why in this case, which is identifying these in the course of criminal investigations. So there was no history at the time of the founding of serialization requirements. And I appreciate you distinguishing between general and specific. But how specific do you have to be? Here you're asking, you've got to be very specific. I mean, you have to have the very analogous regulation for the same purpose of the current regulation. That's very specific. So the Supreme Court addressed this very issue earlier this year. And the court said that, as Your Honor has indicated, we can't get too far into the weeds. You have to look at the purpose. And you can go from a higher level of generality if there's a general purpose that is applied. In that case, the court said that dangerous people were around at the founding. And there were certain regulations that regulated dangerous people. This is good enough to uphold that statute. In this, if you look at the stamping requirement that applied at the time of the founding, it had absolutely nothing to do at any level of generality with what the state is trying to accomplish in this situation. So what are you asking us to do? I mean, you want us to correct, I guess, the district court's, what you see as an error in the initial interpretation. Yes. And should we go beyond that? So I would recommend, Your Honor, that there be a reversal and a remand. At the very least, the district court's interpretation of the statute can't stand. I mean, it's just, that would, in my view, clear error. And I would ask the court to reverse and remand for further proceedings. I think that the court has enough in front of it to hold that the statute is unconstitutional on its face with respect to the manufacturing ban and unconstitutional as applied to these plaintiffs with respect to the serialization requirement for just the possession, not the sale. Although the district court didn't really go into the various factors, so I think they would need to go into the various factors to get to the second part. So in your view, the district court didn't do a proper Bruin analysis, and so you'd like it to go back for the district court to do a Bruin analysis that's in line with your position? Correct, Your Honor. I don't think that, I'm not asking the court to say that we win. We need a proper analysis at the district court. And if that analysis, we're confident that if the analysis is done, then we'll win. Right. So what is your position on why the newer ATF rule wouldn't preclude you from obtaining relief even if you won at the district court? So the 22-2 rule requires Polymer 80 to stamp serial numbers on its unfinished friends and receivers. It can do that and send them up here, and my client still can't make guns. Because, again, the manufacturing ban prohibits the manufacturing of guns, whether or not they're stamped with a serial number. So that rule has nothing to do with my clients. I will reserve the rest of my time. Thank you, Your Honor. Thank you. Thank you. May it please the court. I'm Shannon Stevenson, Solicitor General on behalf of Governor Polis. Your Honors, under Colorado law, the plaintiffs here can bear, keep, acquire, possess, use, own the exact firearms that they want to have for the exact purposes that they want to have them. And they can acquire the parts kits that they want to acquire, and they can assemble those firearms in the exact way that they want to. The only point of contention here between the two sides is whether they have to have a background check and have a serial number on those arms. But that contention, that point of contention, doesn't implicate any of the text of the Second Amendment or any of the core interests of self-defense that the Second Amendment is designed to protect. I want to go first because this, I think, resolves a lot of issues in the case to plaintiffs' interpretation of the manufacturing ban in subsection 5. Manufacturing ban does not prevent the plaintiffs in this case from acquiring a serialized parts kit with an unfinished frame or receiver. Okay, but that cobbles together both sections because you say it doesn't prevent them from manufacturing a serialized kit. Correct. Right. So you're necessarily, you have to put them both together in your view to analyze it. As I understand the position that plaintiffs got to in their reply brief, what they're saying is, I can't get an unfinished serialized frame and finish it and then build a weapon from that under the manufacturing ban. And that is incorrect. They are permitted to do that as long as it has a serial number on it. And I hope that sort of puts to bed that question, but I'm happy to entertain any questions about that interpretation. Do they have to also have a background check to get it? Yes. Okay. So they can get an unfinished polymer 80 with a serial number and a background check. Correct. And then they can finish that unfinished frame, assemble their weapon, and none of that is precluded by subsection 5 of the act. And I just want to point to, as quoted at the district court's order at page 13, one of the plaintiffs himself confirmed that that was his understanding of the statute as well. So this is not anomalous or strange. And just to tie a bow on that, I mean, it would make no sense to say you're prohibited from finishing a serialized frame, but we're allowing you to have a serialized frame under subsection 1, because there would be no point in having a serialized frame unless you were going to finish it and build a weapon out of it. So it would be inconsistent with all of the purposes of the statute, if plaintiff's interpretation were correct. Let me go then to the plaintext argument, because we think that the conduct at issue here is not within the plaintext of the Second Amendment. Second Amendment clearly applies to keeping and bearing, and in Heller the court described that as the individual right to possess and carry weapons in case of confrontation. And clearly nothing about having a background check or a serial number implicates that right. And the plaintiffs admit as much. They confirm throughout their testimony that their rights to have the weapon that they want, the operation of that weapon, the use of that weapon, none of that is impacted by these requirements. Their annoyance with that is completely separate from what their rights in the Second, or their interests in the Second Amendment are. And I would direct the court to the Fifth Circuit's decision in McRory on this point. I think it does a really good job of explaining these, you know, the absence of implied rights. But I want to be clear, by saying that there aren't implied rights under the Second Amendment, we're not saying that any regulation that didn't directly go to keep and bear might not actually impact those rights. It could. You could have a regulation on acquisition that was so burdensome that it actually affected your ability to keep or bear a weapon. And that would be fair game to be within the plaintext of the Second Amendment. That's not the situation we have here. The plaintiffs have not claimed any type of burden on their rights like that. So what does your Heller position do to person-to-person transfers without consideration? So, Your Honor, if we're going to the commercial sales aspect of this, I don't think the Supreme Court hasn't defined exactly what it meant when it has repeatedly said that conditions and qualifications on commercial sales are presumptively lawful. We don't have them diving into that. But I don't think it's implicated by this case. Here, the weapons that are at issue, we know, were acquired in commercial sales from Polymer 80. So, you know, there's just no dispute about that here. Some of those are pre-act, though. That's true, Your Honor. Are you trying to sweep in pre-act purchases? I think that's fair to do when you look at the purpose of the statute, which is to close this loophole in acquisition of weapons and people avoiding background checks. And here we specifically know... Okay, hold on just a second, because first I want to tackle, you had people who purchased un-serialized Polymer 80s, we'll use that as a generic term, when it was not against the law. That's correct. And so you're not attacking the purchase of those. Correct. And then you have, but now it's illegal to possess them. That's right. All right. And it's also, it would be illegal for a person-to-person transfer of those.  All right. And your position is, yes, we can go ahead and sweep. I mean, at some point, for purposes of this analysis, don't we have to give some credence to the idea that maybe the plaintiff has made an argument that has to be addressed under a Heller, or not a Heller, but a Bruin analysis, and we can't just sweep it out with Heller? Well, let me talk about the reasons why we think this law, and in particular as it applies to these past purchases, is presumptively lawful. First, there is the commercial sales aspect of it. And we think because these were obtained in commercial sales, no dispute, the plaintiff's had months to get them serialized under the law, that that is within the scope of commercial sales. And including when you look at the purpose of the statute as a whole, which is simply to close this commercial sales loophole. Second, the plaintiffs here were clear that their view of privately made firearms is that they are not transferred in private sales, or gifted, or anything else. And so I think they've sort of foreclosed this notion that there would be private sales going on that wouldn't be subject to that commercial sales, or conditions and qualifications on commercial sales. So you're saying they can't even get them in the first instance through a transfer, a private transfer with no consideration? According to their own testimony, these weapons are not used, they're not exchanged privately through any kind of transfer. No, they're saying that they don't do it. Right, and that's all the evidence. But they're also saying that they want to get them. Through commercial sales. All of their testimony is that they would like to purchase these from companies like Polymer 80. But let me take one step back from that too, because I don't think that the conditions and qualifications on commercial sales are the only reason these are presumptively lawful. The other reason is that the entire point of this statute is to make sure that these weapons don't get into the hands of people who aren't supposed to have them. And prohibitions on felons and other unfit people are another category that's recognized as a presumptively lawful regulation on these weapons. And so I think when you look at the purpose of this statute, it also falls within that presumptively lawful category. And I would again direct the court to the McRory case, which I think walks through this with respect to the expanded background checks at issue there. Does Colorado have its own felon and possession laws? Your Honor, I don't know the answer to that. I assume so, but I don't know. Because presumably some of these might not involve interstate commerce if it's a homemade type weapon. I haven't heard that argument made in this case. I haven't either. I'm just throwing it out to you. Yeah, I do think that certainly under Colorado law, we would be enforcing federal law as well to prevent felons from being in possession of firearms, as well as other dangerous people and children and other people who are not fit to have firearms. I want to talk about the fact that, and again, we think these laws are presumptively lawful under both the conditions and qualifications on commercial sale and the fact that they're designed to prohibit inappropriate people from having weapons. But, of course, a presumptively lawful law, that's not the end of the inquiry. You could disprove that. And especially in light of this Court's opinion in the RMGO case, I want to talk about the reasons why this particular law is not abusive in any way. You know, the plaintiff had suggested that they would have to get a manufacturing license in order to assemble these parts kits. Going back to the interpretation of the statute, that's just not correct. They just have to have a regular background check, like everybody else who's buying a weapon. This law is not discretionary. It applies to anybody who's doing this. It doesn't disarm any law-abiding citizens. The whole point of it was to close a loophole in what's otherwise been a longstanding program, you know, under federal law, for almost 100 years of requiring background checks and requiring serialization of firearms. And we have abundant evidence in the record of the problem that this law is designed to address, which is a new problem that was driven by significant technological changes and how people are able to manufacture these weapons very easily at home with very little skill and not even really specialized tools. And given all of that, I think, and again, the burden on the plaintiffs in this case to comply is minimal and certainly tolerated in many other instances. And I think it's worth noting that the Supreme Court, in every one of its recent decisions on the Second Amendment, has stated over and over again these, whether you call it presumptively lawful, presumptively constitutional, these regulations that it seems to suggest are not within the scope of the Second Amendment. And I would specifically point to Bruin footnote 9, where Justice Thomas says, this opinion shouldn't suggest in any way that shall issue permitting regimes that require background checks and training, fingerprinting, things like that, that there's any concern about their constitutionality. And I think given that, the law that we have here is right in line with those types of laws. And in fact, probably even those might even be more directly impactful because they go straight to, you know, whether or not you are even allowed to carry a weapon. Counsel, could I get you to respond to your opposing counsel's argument that under the second step in Bruin, there really is not a historical tradition supporting your position? Here would be my case on that. And I agree with my opposing counsel that I do think the court should remand if it thinks that the Bruin Step 2 analysis needs to be done, because the district court really didn't touch those facts. Under Bruin, I think we're clearly in that third bucket where we're talking about unprecedented societal change and dramatic technological changes that make the situation far, far different from anything we can compare it to at the founding. And Bruin says there we need to bring a nuanced approach. And Chief Justice Robertson-Rahimi says we're not trapped in amber. We have to have some flexibility in how we can regulate guns. So we're then looking to the why and the how. And here, the why of this law is to keep firearms out of the hands of dangerous people. And I think under Rahimi, the court concluded that that was something that was consistent, that that why is consistent with the approach at the founding. The same things apply to keep weapons out of the hands of dangerous people. Now, with respect to the how, and particularly background checks and serialization, clearly those things were not methods that were used or even possible at the time of the founding. So those are different. But what I would point to, and if you look at Dr. Spitzer's report, he goes through a litany of laws that existed at the founding and around that time. And what they show is when firearms presented a public safety hazard, states regulated them to reduce that hazard. What was the hazard? I mean, what hazards were they regulating? Well, the examples that Dr. Spitzer goes through are trap guns, for instance, which like a spring-loaded shotgun that could inadvertently kill somebody, punt guns that were decimating wildlife, storage of gunpowder that could cause fires, all those kinds of things. To your point, I think spring-loaded shotguns, I think that is a sort of interpersonal violence thing. But most of them were not interpersonal violence in the way, except with respect to bowie knives. Those were weapons that were perceived to be very dangerous and that were regulated abundantly by the states. So, agreed, that's a high level of generality, but we're at a point of change in time where things are quite different from the founding, and we're trying to deal with a very specific problem, which there is a lot of evidence. You can see it in the headlines, of course, the issues with the ghost guns. What do you think about, I mean, your statute seems to take particular aim at 3D printed guns, but it seems to sweep in a lot of other homemade guns as well. Do you see a distinction between, I mean, when you have a general prohibition, I'm sorry, this is going to take her over. Do you see a distinction with taking aim specifically at a 3D printed gun, a very highly technical situation there, as opposed to basically every other kind of homemade gun? I mean, go ahead. Your Honor, may I answer your question? My time is up. So, I guess a couple of responses. With respect to the manufacturing ban, which calls out 3D printing, the other types of manufacturing that would be included there, I think, would also be sort of sophisticated, newer technology types of manufacturing. But the text is not so limited, is it? Well, and again, I think this comes back to how do you define manufacturing, and our position is it is defined separately in the statute from assembly, which would relate to these parts kits. And really, I'm not aware of other common ways that anyone is making a gun, either besides other than 3D printing or assembling a parts kit in an amateur type situation that's not a firearms manufacturer. So I'm not sure if there's an example that you're thinking of, but I'm not aware of anybody with an iron forge in their backyard. I don't know anyone who's making guns myself. But, I mean, presumably somebody with sufficient machinist skills could take a block of steel and turn it into a gun. Maybe. I don't know. It's not in the record. I think that would fall within the manufacturing ban.  Okay, before you leave, Judge Kelly, do you have anything further? No, thank you. All right, thank you. Thank you. Could we add a minute and a half? Yes, Judge. Thank you, Your Honor. Counsel slipped up and more or less admitted that the point of this statute is to prevent people from easily making firearms. It was kind of in the middle of her argument. It clearly is designed, the whole point of the statute, that screams from the legislative history that addressing the firearms kits from Polymer 80 was the whole point of the statute. I think she also said that if you could make one out of a block of steel that you wouldn't be able to do that, too. Correct. Now, Your Honor, she also talked about dangerous and unusual arms. The evidence was these were Glocks, Glock handguns, but not dangerous and unusual arms. As a matter of fact, protected under Heller. This statute prohibits my clients from making firearms that are protected under Heller, period. Second, actually, I guess I'm third. Counsel said only a normal little background check is required. That's just not true. Just look at the statute. It says a person shall not manufacture or cause to be manufactured a frame or receiver, little ellipse there, period, flat, end of story. That's a flat-out prohibition. Then, this subsection does not apply to a federally licensed firearm manufacturer. That's the only exception. There's no background check involved here, except to the extent that a background check is required to become a federally licensed firearm manufacturer. So the Colorado statute requires a single person making a single firearm to get the exact same federal firearms license that Smith & Wesson has to go out and get. Now, could the state of Colorado have said, well, if you want to make a firearm, you've got to get a background check? That's a separate question. And we know from the Department of Public Safety's website that the average background check takes about 40 minutes. When I go and get a firearm, you get it while you're waiting. This requires months and months, costs hundreds of dollars. You have to submit fingerprints. You have to go get an interview. It's discretionary. I assume it's discretionary. Otherwise, why is there an interview? And then you have to wait for the federal government to eventually issue a license before you can make a single firearm. This falls squarely into Bruin footnote 9 as it's not a background check requirement. It's a licensing requirement, and it's an abusive licensing requirement as applied to my clients. Do you agree with counsel's statement that your clients on the record stated that they weren't intending to sell, that there weren't going to be any commercial transactions regarding these? My clients make these firearms for their personal use. They do not intend to sell these firearms. And therefore, the court was correct that it is the part of the statute that prohibits the possession of these that my clients are affected by. Now, the court asked, well, what if you get a serialized frame and receiver from Polymer 80? And could you go ahead and make the firearm? The counsel said, well, sure. All you have to do is get a background check. Well, that's not accurate. You have to do much more than get a background check. You have to apply for a federal license to make even a single firearm. And so it is not a background check requirement. It is a licensing requirement under the statute. Okay, counsel, I'm going to stop you there. Your time is up, but before you leave, I just want to turn to Judge Kelly to see if you have anything. No, thank you. Okay, thank you so much. Well, thank you, counsel, for your arguments. You're excused.